## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

MARK W. DOBRONSKI, individually
and on behalf all others
similarly situated,

          Plaintiff,

v.

TONY PACKO'S TOLEDO, LLC,

          Defendant.

CLASS ACTION
Case No. 2:25-cv-13117-RJW-APP
District Judge Robert J. White
Mag. Judge Anthony Patti

---

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

NOW COMES Plaintiff, MARK W. DOBRONSKI, by and through his attorneys, and respectfully requests this Honourable Court to enter an order denying Defendant's above-entitled motion for the reasons set forth in the underlying brief.


Dated: December 24, 2025

PLAINTIFF, on behalf of himself
and others similarly situated,


*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.      Whether the Court should deny Defendant's Motion to Dismiss because the Plaintiff has plausibly alleged his standing under the TCPA?

**Suggested Answer**:  Yes.

2.      Whether the Court should deny Defendant's Motion to Dismiss because Plaintiff has plausibly alleged that the TCPA covers text message calls?

**Suggested Answer**:  Yes.

3.      Whether the Court should deny Defendant's Motion to Dismiss because there is a private right of action for the caller ID regulations contained in 47 C.F.R. § 64.1200(e)?

**Suggested Answer**:  Yes.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>
## <u>FOR THE RELIEF SOUGHT</u>

*Shelton v. Pro Source Lending Group LLC*, No. CV 24-4394, 2025 WL 817485 (E.D. Pa. Mar. 14, 2025).

*Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013).

*Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015).

*Wilson v. Better Mortg. Corp.*, No. 25 CIV. 5503 (PAE), 2025 WL 3493815, at *5 (S.D.N.Y. Dec. 5, 2025).

*Kyllo v. United States*, 533 U.S. 27, 28 (2001).

*Bostock v. Clayton County*, 590 U.S. 644 (2020).

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

*Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-cv-1569, 2024 WL 184449, at *5–7 (M.D. Pa. Jan. 17, 2024).

*Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373, 380 (E.D. Mich. 2025).

# TABLE OF CONTENTS

I.   **Introduction** ...............................................................................................1

II.  **Legal Standard** .........................................................................................1

III. **Argument** ...................................................................................................3

   A.   The Plaintiff has standing because his number isn't a business number.....3

   B.   The TCPA applies to text message calls. ..................................................9

     1.   Section 227(c) of the TCPA provides a private right of action for text messages, which are "calls." ..........................................................................9

       i.   The plain text of the TCPA confirms that the term "call" includes text messages.....................................................................................................12

       ii.   The authorities Defendant cites are unpersuasive and commit construction errors.....................................................................................15

       iii.   Post Loper Bright, the FCC got it right. .............................................19

     2.   The Plaintiff has pled he is a "residential" subscriber. ..............................22

   C.   There is a private right of action for Section 64.1601(e)............................24

IV.  **Conclusion**.................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) .............................................................2

*Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737 (6th Cir. 2013)...............................................................................................11

*Barton v. Bright Solar Marketing LLC*, No. 3:25-CV-05310-DGE, 2025 WL 2880136 (W.D. Wash. Oct. 9, 2025) ....................................................................30

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................2

*Bostock v. Clayton County*, 590 U.S. 644 (2020) .........................................16, 18

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ...............................................11

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ......................................................24

*Davis v. CVS Pharm., Inc.*, 2025 WL 2491195, at *1 (N.D. Fla. Aug. 26, 2025). 20, 21

*Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012) ......................18

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980)............................................................................................19

*Dobronski v. Juliasangel Mktg., LLC*, No. 2:24-CV-12379-TGB-APP, 2025 WL 2659265 (E.D. Mich. Sept. 17, 2025)..................................................................30

*Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025) .1, 29, 30

*Esquivel v. Mona Lee, Inc.*, No. 3:25-CV-00607, 2025 WL 3275607 (S.D. Cal. Nov. 24, 2025) ...................................................................................12, 14, 22

*FCC v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025)..........................................15, 21

*Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359 (N.D. Ga. Aug. 7, 2025)..28

*Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-cv-1569, 2024 WL 184449, at *5– 7 (M.D. Pa. Jan. 17, 2024). ..........................................................................28, 29

*Jones v. Blackstone Med. Serv's., LLC*, 2025 WL 2042764 at *4 (C.D. Ill. July 21, 2025). .................................................................................................19, 21

*Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365 (6th Cir. 2015) .................11

*Kyllo v. United States*, 533 U.S. 27 (2001) ......................................................15, 16

*Lozano v. Twentieth Century Fox Film Corp.*,
702 F. Supp. 2d 999 (N.D. Ill. 2010) ...........................................................13, 20

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573 (7th Cir. 2019) .............................................................................................................8

*Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270 (S.D.N.Y. 2024) ........8

*Mitan v. Int'l Fid. Ins. Co.*, 23 F. App'x 292 (6th Cir. 2001) ...................................5

iv

*Mujahid v. Newity, LLC*,
  2025 WL 3140725 (N.D. Ill. 2025) ...................................................11

*Nat'l Cable & Telecom. Ass'n v. FCC*, 567 F.3d 659 (D.C. Cir. 2009) ...........16, 22

*New Prime, Inc. v. Oliveira*,
  586 U.S. 105 (2019)..........................................................12, 19, 21, 27

*Newell v. JR Cap., LLC*, No. CV 25-1419, 2025 WL 2004706 (E.D. Pa. July 16,
  2025) ..................................................................................29

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) ....................14, 22

*Pa. DOC v. Yeskey*, 524 U.S. 206 (1998)..............................................22

*Perrin v. United States*, 444 U.S. 37 (1979) ........................................14

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) .......................................................11, 14

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198 (Fed. Cir. 2005) .....9

*Shelton v. Pro Source Lending Group LLC*, No. CV 24-4394, 2025 WL 817485
  (E.D. Pa. Mar. 14, 2025)...........................................................4, 5, 7

*Shelton v. Target Advance*, LLC 2019 WL 1641353 (E.D. Pa. 2019)....................6

*United States v. Ritchie*, 15 F.3d 592 (6th Cir. 1994) .............................3

*Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303 (11th Cir. 2024) ........................9

*Wilson v. Better Mortg. Corp.*, No. 25 CIV. 5503 (PAE), 2025 WL 3493815
  (S.D.N.Y. Dec. 5, 2025) ........................................................12, 19, 23

*Wilson v. Medvidi*,
  2025 WL 2856295 (N.D. Cal. 2025) .............................................11, 13, 16, 20

*Wilson v. Skopos Fin.*, *LLC*, 2025 WL 2029274 (D. Or. 2025) ......................12, 18

**Statutes**

47 C.F.R. § 64.1200(c)(2) ........................................................9, 17, 24, 26

47 C.F.R. § 64.1601(e) ................................................................29

47 C.F.R. § 64.2305 ....................................................................29

47 U.S.C. § 153 ...........................................................................25

47 U.S.C. § 227(a) ...........................................................17, 18, 22

47 U.S.C. § 227(b) ................................................................13, 20

47 U.S.C. § 227(c) ................................................................passim

47 U.S.C. § 332(a) ......................................................................25

Fed. R. Civ. P. 12(b)(1) ..............................................................2, 3

Fed. R. Civ. P. 12(b)(6) ..................................................................1

Fed. R. Civ. P. 8 ............................................................................2

**Other Authorities**

10 A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure (3d ed. 1998) ......................................................................................5

Black's Law Dictionary, 6th Ed. (1991) ...................................17

Declaration of Mark W. Dobronski ("Dobronski Dec.") ......................................3, 4

Defendant's Motion to Dismiss ("MTD") .................................12, 15, 26

Exhibit A, Surface Transportation Board Docket .....................3

Webster's College Dictionary (1991) ........................................17

Webster's Third New International Dictionary (2002) ............14

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

MARK W. DOBRONSKI, individually
and on behalf all others
similarly situated,

           CLASS ACTION
           Case No. 2:25-cv-13117-RJW-APP
           District Judge Robert J. White

      Plaintiff,           Mag. Judge Anthony Patti

v.

TONY PACKO'S TOLEDO, LLC,

      Defendant.

---

# PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
# MOTION TO DISMISS

## I.   INTRODUCTION

Defendant's motion to dismiss attempts to toss this straightforward TCPA class action based on a prior use of Mr. Dobronski's telephone number, in connection with a railroad he sold several years ago, all before the unsolicited text message calls at issue. And, in support of its motion to dismiss, Defendant advances a theory that is being increasingly rejected by federal courts: that the TCPA does not cover text messages. Relatedly, the Plaintiff has stated a claim because he pleads precisely what the statute requires: the receipt of solicitation calls to his residential telephone. Defendant's other argument that there exists no private right of action for the TCPA's caller ID claims has been rejected by this Court twice (if not thrice) and more recently by at least two other district courts in different circuits and fares no better. *Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373, 380 (E.D. Mich. 2025). The motion ought be denied.

## II.   LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a "short and plain statement" of the claim showing that the pleader is entitled to relief, in order to

1

give defendant fair notice of what the claim is and the grounds upon which it rests, not detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 678 (cleaned up). In determining whether a claim is plausible, the court must "draw on its experience and common sense." *Id.* at 678. A complaint may be dismissed only where it appears that there are not "enough facts to state a claim that is plausible on its face," not merely because of contrary facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The standards for 12(b)(1) challenges are similarly well-settled. There are two types of 12(b)(1) challenges: facial and factual challenges. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Here, Defendant brings a factual challenge under Rule 12(b)(1), submitting extrinsic evidence for its claim that Plaintiff lacks standing because his telephone number is allegedly a business number. Although the Plaintiff has the burden of pleading the standing elements, courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim: the court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party. *Id.* To the extent that the motion does not properly

2

address jurisdiction but instead sounds in the factual merits of the Plaintiff's claims, such motion also ought to be denied and the case proceed. *Id.* n.5.

## III.   ARGUMENT

A.    *The Plaintiff has standing because his number isn't a business number.*

The crux of the Defendant's 12(b)(1) motion is that the Plaintiff lacks standing under the TCPA because his telephone number is allegedly a business number. Not so. It is true that the Plaintiff once (past tense) owned a Railroad. But the Plaintiff sold the Railroad on August 9, 2021, and the Plaintiff returned the telephone number to his own personal use in early 2022. (Dobronski Dec. ¶ 9, 10); Exhibit A, Surface Transportation Board Docket FD 36465. It has thus remained since that time. (Dobronski Dec. ¶ 11). As such, at all times relevant, and certainly during May through September of 2025, the number has been the Plaintiff's residential telephone number, and not a business number. (Compl. ¶ 20, 21).

The Eastern District of Pennsylvania's decision in *Shelton v. Pro Source Lending Group LLC* proves particularly illustrative here. In *Shelton*, the defendant attempted to dismiss on nearly identical standing grounds, as here, on the basis that the Plaintiff's telephone number was previously not only a business number *but adjudicated to be a business number*, making it ineligible for registration on the Do Not Call Registry. No. CV 24-4394, 2025 WL 817485, at *4 (E.D. Pa. Mar. 14, 2025). But, since that time, the plaintiff pled he returned his number to exclusively

personal use and did not use the number for business purposes. *Id.* As the *Shelton* court noted, "Defendants point to no legal authority supporting a conclusion that past commercial use of a number permanently eliminates standing where the number continues to be listed on the NDNC. Conceptually, there is a temporal aspect to standing, as illustrated by the fact that in some cases standing is deemed not to exist because the injury alleged is hypothetical, and in other instances a case allowed to proceed is later dismissed as circumstances change."

Those are precisely the circumstances here. Mr. Dobronski's declaration thus casts doubt on the Defendant's contention that the number remains in use as a business line. To the contrary, it hasn't been used in a business capacity or on the railroad's website since 2022 at latest, over three years before the illegal calls at issue in this case, and on the same level as the five years' worth of residential usage the *Shelton* court credited. That should be the end of the matter: although the telephone number *was* (arguably) a business number before Plaintiff sold his Railroad, the Plaintiff re-obtained the number for his own personal use, at latest, in early 2022, and he uses the number exclusively for personal, family, and household use, including communications with friends and acquaintances, since that time.

Moreover, Defendant's motion is further improper because there is a temporal aspect to standing, and a party who was previously held not to have standing may gain standing at a later time. *See Mitan v. Int'l Fid. Ins. Co.*, 23 F.

4

App'x 292, 298 (6th Cir. 2001) (holding a dismissal for lack of federal question jurisdiction must ordinarily be without prejudice); 10 A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2713, p. 239 (3d ed. 1998) (explaining that if a court lacks jurisdiction, it has no power to enter a judgment on the merits). Even if the Plaintiff's number was a business number at some point, at all times relevant here, the number was used purely for personal, family, and household use and was a residential number. Defendant's jurisdictional motion fails.

Neither *Worsham* nor *Target Advance* mandate a different result. They simply stand for the unremarkable proposition that a business telephone number is ineligible for registration on the Do Not Call Registry. But here, the Plaintiff has pled and adduced contrary evidence of residential use. In *Target Advance*, Mr. Shelton sued Target Advance, a business loan company, for calls made to his personal cell phone, which he also used as a number for his business. 2019 WL 1641353, at *5. The Court's holding in *Target Advance* was limited to whether, during the time of the calls, the Plaintiff's telephone number was eligible for the National Do Not Call Registry. The court also noted that, unlike here, "it appears that the calls at issue were directed and made to the business use of the cellphone, and not to his personal use," because the calls were made to sell business loans. *Id*. In sum, all *Target Advance* stands for is the unremarkable proposition that a plaintiff cannot sue for business-to-business Do Not Call list violations for

business calls for the time that a phone is used for business purposes.

But, as alleged here, Plaintiff sold his business and returned the instant phone number to personal use. For that matter, the calls at issue here were not selling any business goods or services: they were selling hot dogs. Indeed, the *Shelton* court addressed, and distinguished, its previous holding in *Target Advance*, holding that the very same plaintiff *regained standing* to the *exact same telephone number* because he pled and submitted a declaration, as here, that he ceased holding the number out to the world as a business number years ago and obtained a separate number for his business and returned his number to personal use. That's precisely what Mr. Dobronski alleges here. If Mr. Shelton could regain standing by returning his number to personal use despite a court decision against him, so can Mr. Dobronski. For that matter, Defendant cannot point to any authority, just like the Defendant in *Shelton* could not, showing that it is not possible to regain standing by returning a business number to residential use.

Defendant, like the defendant in *Shelton*, seems to contend that *ever* using a telephone number, at *any point*, for *any business purpose whatsoever*, confers an indelible mark on that telephone number rendering it *permanently ineligible* for inclusion on the National Do Not Call Registry. Not only does that proposition find no support in the law, but such a standard would essentially render no phone number eligible for inclusion on the Do Not Call Registry, as doubtlessly counsel

6

for the Defendant, this Court, and its hardworking staff have occasionally taken Court-related calls on their residential phones. As such, on Tony Packo's equation of a failure to prove temporary ineligibility for a right with a permanent lack of standing, "[Dobronski] could theoretically sue [Tony Packo's] again and again, and perhaps eventually prevail." *See Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 280 (S.D.N.Y. 2024). Defendant's position is inconsistent with the proposition that a lack of standing is necessarily not a ruling on the merits. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019) (to preclude a plaintiff "from relitigating—in any court, ever again—any claim encompassed by the suit" requires "a ruling on the merits."). Thus, Mr. Dobronski's arguable prior business use of his number does not confer an indelible mark on its character, and Mr. Dobronski has standing, and unquestionably has had such standing since at least early 2022, because he has fallen within the Do Not Call Registry's residential subscriber requirement since that time.

It is clear that a lack of standing is curable, even during the pendency of a litigation. *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005) (holding that patent holder who held patent at the time suit was commenced, transferred patent away, and then transferred patent back before trial had Article III standing); *cf. Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1309 (11th Cir. 2024) (holding receiver in Ponzi scheme regains standing to sue in the name of

former fraudulent corporate structures). Defendant can't point to a decision holding that someone who has lost standing cannot later rehabilitate or regain their standing, because that's not the law. In fact, the law says the *opposite*, that Mr. Dobronski *can* regain his standing. A court that has determined it lacks jurisdiction lacks the power to decide further on the merits of the issues before it. Therefore, a plaintiff can regain standing when they later suffer a cognizable injury in fact sufficient to confer federal subject matter jurisdiction, including by receiving a call, as here, to their *purely residential* telephone number that is properly listed on the Registry, exactly as required by the statute. 47 C.F.R. § 64.1200(c)(2).

Mr. Dobronski regained standing to assert Do Not Call Registry claims to his solely personal telephone number as soon as he started using it again for solely residential, household, and personal purposes in early 2022. There can be no dispute that, at all times relevant, Mr. Dobronski had standing and that his registration was proper because he was a residential telephone subscriber exactly of the type intended to be on the Registry and which the Registry was designed to protect. Because this lawsuit was filed while Mr. Dobronski had standing, for calls received in the time where Mr. Dobronski had standing, and Mr. Dobronski will continue to have standing at trial, under the plain text of the statute, it should proceed. Mr. Dobronski's number has been and remains a residential number since at least early 2022. Accordingly, he has standing to assert the claims he does here.

B.  *The TCPA applies to text message calls.*

Defendant further contends that the claims here should be dismissed for two related reasons: because a text message is not a telephone "call" under the TCPA and because cellular telephone numbers are ineligible for registration on the National Do Not Call Registry. Both arguments fail.

1. Section 227(c) of the TCPA provides a private right of action for text messages, which are "calls."

Consider a 1991 law that bars "vehicles" from a park. That law applies equally to Cybertrucks and to sedans, even though the former didn't exist at the time. So, too, here: The TCPA prohibits sending text messages to numbers on the Registry, just as it prohibits traditional voice calls. Of course, text messaging didn't exist yet when the TCPA was passed in 1991. But that is no matter: The plain meaning of the word "call" in the TCPA has long been understood to encompass any attempt to communicate by phone, "regardless of whether that call is communicated by voice or text." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

The Sixth Circuit has twice rejected the precise reading Defendant advances and has held that text message calls are "calls" under the TCPA. *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015). The Sixth Circuit is not an outlier here. *Campbell-Ewald Co. v. Gomez*, 577

U.S. 153, 153 (2016)). A growing number of courts are similarly increasingly

rejecting the reasoning embraced by the three outlier authorities Defendant cites.

*See, e.g.*, *Mujahid v. Newity, LLC*, 2025 WL 3140725, at *2–3 (N.D. Ill. 2025);

*Wilson v. Medvidi*, 2025 WL 2856295, at *2–4 (N.D. Cal. 2025); *Wilson v. Skopos*

*Fin.*, *LLC*, 2025 WL 2029274, at *4–5 (D. Or. 2025); *Esquivel v. Mona Lee, Inc.*,

No. 3:25-CV-00607, 2025 WL 3275607, at *2 (S.D. Cal. Nov. 24, 2025).

"In brief, although modern parlance tends to distinguish between phone calls

and text messages, the meaning of "telephone call" in 1991—when the TCPA was

enacted—was broad enough to encompass text messages." *Wilson v. Better Mortg.*

*Corp.*, No. 25 CIV. 5503 (PAE), 2025 WL 3493815, at *5 (S.D.N.Y. Dec. 5,

2025). Defendant insists no one in 1991 would have described text as "telephone

call[s]" in "ordinary meaning." (MTD at 23.) That's not how statutory

interpretation works. Courts look to statutes' ordinary "meaning at the time

of … adoption" to interpret them, not "modern intuition." *New Prime, Inc. v.*

*Oliveira*, 586 U.S. 105, 114 (2019). Modern parlance can be misleading as times

change. *See id.* at 114-16. Defendant also has no answer for the TCPA's autodialer

provisions, which uses "call" to refer to written messages received on a pager, the

precursor technology to text messaging that existed in 1991, and which would have

displayed an incoming message as written text. *See* 47 U.S.C. § 227(b)(1)(A)(iii).

If a text "call" to a pager can violate the TCPA, a text "call" to a cell phone can

too, because it shows "that the term 'call' cannot invoke only the common usage
… in which a 'call' refers to oral communication between two parties via
telephone." *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999,
1004–05 (N.D. Ill. 2010).

Moreover, this interpretation derives support from the key operative term of
the TCPA's Do Not Call Registry provisions, which prohibits "telephone
solicitations," which are defined in the TCPA as "the initiation of a telephone call
*or message* for the purpose of encouraging the purchase or rental of, or investment
in, property, goods or services, which is transmitted to any person." *Id.* § 227(a)(4).
That definition is "more concerned with the purpose of the telephone
communications than the form in which those communications are transmitted."
*Medvidi*, 2025 WL 2856295, at *3. Apart from being wrong as a matter of
statutory construction, Defendant's, *El Sayed's*, *Jones'*, and *Davis'* interpretation
ignores another important admonition: "[I]t is ultimately the provisions of our laws
rather than the principal concerns of our legislators by which we are governed."
*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). "Defendant's
invitation to inject a distinction between written and oral telephone solicitations is
contrary both to the remedial bent of the TCPA and precedent." *Id.* It also
contravenes the long-established precedent on the remedial purposes of the TCPA.
*Esquivel*, 2025 WL 3275607, at *3.

i.   *The plain text of the TCPA confirms that the term "call" includes text messages.*

Defendant contends that a single use of the phrase "telephone call" in section 227(c)(5)'s private right of action means that the Do Not Call List rules cannot apply to text messages. That's incorrect. The plain meaning of the word "call," long recognized by other courts and the FCC, refutes that argument.

To interpret a statutory term, courts look to its "ordinary meaning" "at the time Congress enacted the statute," referencing dictionaries of the era. *Perrin v. United States*, 444 U.S. 37, 42 (1979). Here, the "ordinary, contemporary, common meaning" of the word "call" in this context is "'to communicate with or try to get into communication with a person by a telephone.'" *Satterfield*, 569 F.3d at 953–54 & n.3 (quoting *Webster's Third New International Dictionary* (2002)). As noted above, the Supreme Court and the Sixth Circuit also disagree with Defendant's interpretation. Defendant's proposition focuses mainly on the single use of the word the "call" in section 227(c)(5). (MTD at 23-25.) But reading section 227(c)(5)'s private right of action in context with the substantive DNC provisions of section 227(c), including that they apply to "messages," confirms that text messages are covered. Defendant's approach leaves telephone subscribers "at the mercy of advancing technology" and permits it to "erode the privacy guaranteed by the" TCPA merely because technology has advanced. *Kyllo v. United States*, 533 U.S. 27, 28 (2001) (extending Fourth Amendment protections to new technology).

Congress can nevertheless craft an open-ended statutory mandate that *accommodates* developments "in light of advances in technology," *FCC v. Consumers' Rsch*., 145 S. Ct. 2482, 2505 (2025). That's precisely what Congress did when it directed the FCC to "initiate a rulemaking proceeding" concerning the same. 47 U.S.C. § 227(c)(1). Defendant advocates a reading that rewrites the statute to *shrink* the TCPA's privacy protections because technology has changed. There are limits to the "power of technology to shrink the realm of guaranteed privacy." *Kyllo*, 533 U.S. at 34. A Court looks to the plain meaning of the text, rather than the specific facts or technology that Congress may have had in mind[1] in 1991 at the time of the TCPA's passage. *Medvidi*, 2025 WL 2856295, at *2.

Context supports the ordinary meaning of § 227(c)'s text here and establishes that Congress articulated an intelligible principle untethered to subsequent technological developments by authorizing the FCC to protect *all* "residential telephone subscribers" who receive text "messages." 47 U.S.C. § 227(c)(1). And that remains true even if text message calls were not the "particular manifestation of a problem" that was front of mind when the TCPA was

---

[1] The Supreme Court's recent decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), all but precludes the analysis conducted in *El Sayed, Jones,* and *Davis. Bostock* makes clear that the plain text controls, even if the Congress that passed the law *never intended* the law to be used so broadly. *Id.* at 652. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Id.* at 652-53.

enacted. *Nat'l Cable & Telecom. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009). The TCPA's DNC provisions grant the FCC broad authority, and the FCC has exercised that authority to provide *explicit statutory protection*, not mere interpretative guidance, in the TCPA's implementing regulations, to subscribers receive text messages. *See* 47 C.F.R. § 64.1200(e) (confirming that all regulations are applicable to "telephone solicitations or telemarketing calls or text messages").

Start with what the statute prohibits: unwanted "telephone solicitations." 47 U.S.C. § 227(c)(3). "Telephone solicitation" is a defined term in the TCPA. *Id.* § 227(a)(4). In essence, it means "a telephone call *or message*" "which is transmitted to any person" for commercial purposes, subject to certain exceptions. *Id.* Text messages fit that definition. First, to state the obvious, a text message is sent to a "telephone." The word "message" suggests that Congress had no particular technology in mind: "Message" means "[a]ny notice, word, or communication, *no matter the mode and no matter how sent*, from one person to another." Black's Law Dictionary, 6th Ed. (1991) (emphasis added). Even a "call" is a "request, demand, or command." Black's Law Dictionary, 12th Ed. (2024). And Congress's use of the word "transmitted" also conveys no preference for wires: "Transmit" means "to send a signal *by radio waves or by wire*." Transmit, Webster's College Dictionary (1991) (emphasis added). So, a "telephone solicitation" can be received on any kind of telephone in any manner. Congress

14

referred to "call or message" disjunctively to broadly capture many telephone technologies. *See, e.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). "[A] voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Skopos*, 2025 WL 2029274, at *4.

There is only one other reference to "calls" in § 227(c), and it has the same breadth as "telephone solicitations." In § 227(c)(1)(D), Congress directed the FCC to assess whether it needed additional statutory authority "to further restrict telephone solicitations, including those *calls* exempted under [former] subsection (a)(3) [defining "telephone solicitation"]." So § 227(c)(1)(D)'s reference to "calls exempted under" the definition of "telephone solicitation" presumably mirrored that definition of "call"—which, as explained above, broadly encompasses a "telephone call or message" and thus covers text messages even more clearly than the word "call" standing alone. 47 U.S.C. § 227(a)(4); *see supra*. As a matter of good statutory construction, a "call" includes a text.

ii.     *The authorities Defendant cites are unpersuasive and commit construction errors.*
Defendant cites *El Sayed*, *Davis*, and *Jones* for the proposition that the TCPA cannot apply to text messages. But those cases are unpersuasive because they rely on extratextual considerations. *Bostock*, 590 U.S. at 652-53. There, the respective courts each held that a text message could not be a "call" for purposes of § 227(c)(5)'s private right of action because "[t]ext messaging was not an available

technology in 1991," and "in today's American parlance, 'telephone call' means something entirely different from 'text message.'" *Jones*, 2025 WL 2042764 at *4. *Jones* and its progeny[2] get statutory interpretation wrong in two important ways, by placing too much weight (1) on modern intuitions of contemporary speech, and (2) the fact that text message calls did not exist in 1991. *Better Mortg.*, 2025 WL 3493815, at *9. Both of these arguments are unpersuasive.

    *First*, as the Supreme Court has warned, "modern intuition" doesn't always match "evidence of a term's meaning at the time of [a statute]'s enactment." *New Prime*, 586 U.S. at 114. Statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315–16 (1980); *Bostock*, 590 U.S. at 652-53. Like a 1991 law that bars "vehicles" from a park, *Jones* and its progeny went astray by reflexively applying extratextual modern intuitions about how people today discuss text messages to language from 1991, before the first text message was ever sent. But the 1991 meaning of "call"—which "refers to both oral and written communications"—is what matters. *Medvidi*, 2025 WL 2856295, at *2; *see Lozano*, 702 F. Supp. 2d at 1007.

    "In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage."

---

[2] The same faulty reasoning is embraced nearly identically in all three cases.

*Id.* Under that reasoning, the word "call" could not refer to a text message sent to a "paging service," which is explicitly protected. Similarly, § 227(b)(1)(A), an autodialer provision, uses the word "call" several times to describe a prohibited transmission to both a "cellular telephone" and "a paging service." It's incongruous to refuse to apply this definition to an evolved form of paging. *Jones* and its progeny also rely on that same intuition, finding it impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the "analysis begins and ends there." *E.g.*, *Davis*, 2025 WL 2491195, at *1.

But statutory interpretation does not turn on modern colloquial usage. To the contrary, when language has evolved since a statute's enactment, current usage can be misleading. For example, in *New Prime*, the Supreme Court explained that the statutory term "contracts of employment" in the Federal Arbitration Act nowadays might exclude independent contractors. 586 U.S. 105, 114 (2019). But that "modern intuition" did not match the "evidence of the term's meaning at the time of the Act's adoption," which revealed that "'contract of employment' usually meant nothing more than an agreement to perform work." *Id*. The Supreme Court therefore held that the statutory exception at issue reached not just conventional "employees," as modern parlance might suggest, but also modern independent contractors, as definitions from the time of the statute's enactment showed. *See id*. at 114–16. *New Prime* illustrates the proper interpretation when a mismatch arises

17

between current intuitions and the original meaning: the latter controls—not (as Defendant's cases put it) how an "ordinary person would think of a text message" today, *Davis*, 2025 WL 2491195, at *1, or "today's American parlance," *Jones*, 2025 WL 2042764, at *4. As a result, because the text's statutory provision already covers text messages under a proper interpretation of the word "call," there is no need to rely on modern intuitions to advance some contrary interpretation.

*Second*, it's irrelevant that text messages did not exist in 1991 when Congress extended protection to "calls." *See Consumers' Rsch.*, 145 S. Ct. at 2505; *Oncale*, 523 U.S. at 79; *Nat'l Cable & Telecom. Ass'n*, 567 F.3d at 665. Courts look to the meaning of the words Congress used, not the "particular manifestation of a problem" that would have been front of mind. *Id.* Congress articulated a broad intelligible principle for rulemaking untethered to technological developments. Especially in this context, where Congress knows that communications technology evolves with time, courts should not lightly assume that Congress drew arbitrary lines based on the specific technology used, particularly in a section dealing with "consumer protections," Section 227(c). *Esquivel*, 2025 WL 3275607, at *3. It is the meaning of those terms that governs, not the specific facts or technology that Congress would have had in mind in 1991. As explained, the statute *does* explicitly cover any "telephone solicitation," which is expressly defined to include any "call or message." 47 U.S.C. § 227(a)(4). "The fact that a statute can be applied in

situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pa. DOC v. Yeskey*, 524 U.S. 206, 212 (1998).

    iii.    *Post* Loper Bright*, the FCC got it right.*

    *Jones* and its progeny also disregarded the FCC's longstanding interpretation of "call" to include text messages, ignoring the entirety of the Supreme Court's holdings in *Loper Bright* and *McKesson*. 2025 WL 2042764, at *4–5. Sometimes, "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Even after *Loper Bright*, agencies' reasonable interpretations in appropriate cases are entitled to deference. Neither case affects explicit agency rulemaking under the APA, so long as the agency promulgates law consistent with Congress' articulated intent, not ambiguity or silence. *Id*. at 394-95. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.* That's precisely what Congress did when it directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1), and which resulted in the regulation.

    The FCC has recognized since 2003 that when the statute says "call," it means not just voice calls but also text messages. 18 F.C.C. Rcd. at 14115 ¶ 165 (defining telemarketing calls to "encompass[] both voice calls and text calls to wireless numbers"). This interpretation is in lockstep "with the statute's text,

19

purpose, and context, and is informed by the agency's subject matter expertise. Its interpretation thus adds persuasive support that Congress intended § 227(c) to cover text messages." *Better Mortg.*, 2025 WL 3493815, at *8.

It's easy to see why the FCC's rulemaking is in accord. The DNC provisions are built around the defined term "telephone solicitation," which includes a "telephone call or message." The FCC later exercised its Congressionally-authorized authority to provide *explicit statutory protection* in the TCPA's implementing regulations, and not mere interpretative guidance, to subscribers who use their telephone numbers to receive text messages, under APA regulation making, which is unaffected by *Loper Bright*. *See* 47 C.F.R. § 64.1200(e) (confirming that all Do Not Call List regulations are applicable to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers"). As an appropriately promulgated administrative regulation authorized by Congress, that statutory pronouncement has the force and effect of law, even after *Loper Bright*. *Chrysler Corp. v. Brown*, 441 U.S. 281, 282 (1979).

Even if the statute left room to doubt that a text message can be an actionable violation of the Do Not Call List provisions (which it doesn't), the FCC's longstanding interpretations of the words "call" and "message" should still carry the day. The FCC is regulating here with authority expressly delegated by Congress. 47 U.S.C. § 227(c)(1)(A) (tasking the FCC with evaluating approaches);

47 U.S.C. § 227(c)(1)(E) (permitting the FCC to make rules). That broad language grants discretionary authority to "fill up the details," accompanied by "flexibility" to determine what rules will best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395. Congress in 1993 directed the FCC to decide if cell phone companies are "common carriers" whose subscribers have TCPA rights, and again in 1996 to address whether new services, like text messages, provided by them were "exchange services." *Compare* 47 U.S.C. § 332(a)(1)(A), 47 U.S.C. § 153(53), (54) *with* 47 U.S.C. § 227(c)(3). That delegates to the FCC "authority to give meaning to a particular statutory term," like "call." *Loper Bright*, 603 U.S. at 395.

Acting under that express delegation, the FCC reasonably explained that prohibiting text calls to numbers on the Do Not Call List "make[s] … enforcement easier," "eliminate[s] any potential confusion in the industry," and aligns with both its longstanding determination and the established meaning of the word "call" in other TCPA contexts. 38 F.C.C. Rcd. at 12256–57 ¶¶ 26–27. Even after *Loper Bright* and *McLaughlin*, Congress can still permit an agency to create a definition when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility" *Loper Bright*, 603 U.S. at 395. Because the FCC acted reasonably and consistently in reaching that conclusion,

21

this Court should affirm that "reasoned decisionmaking." *Id.* at 395.

Finally, Defendant says a separate provision, added in 2018, distinguishes between calls and text messages. (MTD at 25-26). But, if anything, § 227(e)(8) shows the opposite: It reinforces that texts are calls and limits any incongruity to that section. It describes a "text message" as coming from a "caller," just like a voice call. The takeaway is that, by identifying two types of calls, both of which come from a "caller," both types require "caller identification."

At minimum, this court should look to the FCC's longstanding and consistent interpretation of the words "call" and "message" as an "informed judgment to which [it can] properly resort for guidance." *Id.* at 388. Recognizing this, even after *Jones* and *Davis*, courts have continued to defer to the FCC's well-reasoned decision to prohibit text messages to cell phones on the DNC, even after *Loper Bright* and *McLaughlin*, particularly in light of the *statutory* rulemaking hook contained in 47 C.F.R. § 64.1200(e). This court should do the same.

2.  The Plaintiff has pled he is a "residential" subscriber.

Defendant's second point, that a cellular telephone subscriber is not a residential telephone subscriber under the TCPA commits a fundamental flaw: it assumes a critical fact not in evidence and which the Plaintiff has not pled, that he received the subject text messages to his cell phone. But Plaintiff did not receive the subject text messages to a cell phone at all. Plaintiff acknowledges an

ambiguity regarding his number being wireless when it was registered on the Do Not Call list, but it is no longer assigned to such a service. (Compl. ¶ 22). Although this should not matter, this pleading ambiguity is curable through amendment.

Plaintiff has pled that he "uses the number for personal, residential, and household reasons," and that it is "assigned to a residential telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses." (Compl. ¶ 20, 21). He is therefore a residential subscriber because Plaintiff has pled precisely what is necessary for a holding that his number is residential. Again, Defendant commits an error of statutory construction.

The TCPA's Do Not Call List provisions grant the FCC broad authority "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Unless otherwise defined, statutory text is given its "ordinary meaning" in the relevant context "at the time Congress enacted the statute." *New Prime*, 586 U.S. at 113. To see why, consider who is protected: "residential telephone subscribers" or, elsewhere, just "residential subscribers." 47 U.S.C. §§ 227(c)(1), (c)(3). Unpacking that language yields the same conclusion. For starters, a "subscriber" is anyone who gets a bill in exchange for service. *See Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 206 (S.D.N.Y. 2024). So a person can be a "telephone subscriber" to any telephone service. *Id.* That leaves the word "residential." As used in the

23

TCPA "residential" is just the opposite of "business." *See, e.g.*, *Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359 (N.D. Ga. Aug. 7, 2025). So the word "residential" refers to the purposes for which a phone is used, not its physical characteristics or location. *Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-cv-1569, 2024 WL 184449, at *5–7 (M.D. Pa. Jan. 17, 2024).

Jackson's textualist analysis is particularly illustrative. There, Court held that calls to cell phones are calls to residential numbers simply because, as a matter of good statutory construction, the word "residential" and "telephone" are both adjectives that modify "subscriber," and describe the type of subscribers protected, "residential" ones, regardless of the technologies they choose to use. *Jackson*, 2024 WL 184449, at *5. This conclusion finds support in FCC regulations dating back to the 1990s explicitly define "residential subscriber" to mean "a subscriber … *that is not a business subscriber*." 47 C.F.R. § 64.2305(d) (emphasis added); *see* 14 F.C.C. Rcd. 15550, 15692 (1999). Nothing in the text shows Congress intended to couch recovery on the presence or absence of a physical wire. Since the Plaintiff has pled the "residential" uses of the number, he is a "residential" subscriber.

C.     *There is a private right of action for Section 64.1601(e).*

Recently, this Court undertook a comprehensive analysis of the genesis of the private right of action for caller ID claims under 47 C.F.R. § 64.1601(e) *Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d at 375. *Selectquote* represents

the most comprehensive analysis of Section 1601(e) undertaken by a Court to date, and it happens to have been conducted by Judge Murphy of this Court. In *Selectquote*, Judge Murphy thoughtfully analysed and explained the promulgative authority for the private right of action under Section 64.1601(e) as under Section 227(c) of the TCPA. Since *Dobronski*, every single court to consider a Section 64.1601(e) caller ID claim has held that there is a private right of action for violations thereof, including Judges Parker and Berg of this Court. *Newell v. JR Cap., LLC*, No. CV 25-1419, 2025 WL 2004706, at *2 (E.D. Pa. July 16, 2025); *Dobronski v. CHW Grp., Inc.*, 2025 WL 2426370, at *7; *Dobronski v. Juliasangel Mktg., LLC*, No. 2:24-CV-12379-TGB-APP, 2025 WL 2659265, at *11 (E.D. Mich. Sept. 17, 2025); *Barton v. Bright Solar Marketing LLC*, No. 3:25-CV-05310-DGE, 2025 WL 2880136, at *5 (W.D. Wash. Oct. 9, 2025).

*Selectquote* and its progeny have thoroughly addressed and rejected the reasoning adopted by the citations relied on in Defendant's footnote, including *Worsham*, and the other *Dobronski* cases. This Court should continue to adopt the same reasoning embraced by all other judges of this Court post-*Selectquote*.

### IV.    CONCLUSION

This Court ought deny the motion or permit leave to amend as necessary.

Dated: December 24, 2025          */s/ Andrew Roman Perrong*

Andrew Roman Perrong, Esq.

Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that I filed the foregoing via ECF on the below date, which will

automatically send a copy to all attorneys of record on the case.

December 24, 2025

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com